IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

REPORT AND
RECOMMENDATION

                                    Plaintiff,

        v.                                              22-cr-36-wmc

BRIAN MITCHELL,

                                    Defendant.

## REPORT

The grand jury has charged defendant Brian Mitchell with being a felon in possession of a firearm, based on a December 22, 2021 traffic stop on the Interstate during which a state trooper opened the door of Mitchell's truck, which led to the discovery and seizure of a handgun.[1] Mitchell has filed a motion to suppress the firearm, claiming that this search exceeded the scope of the traffic stop and was not supported by probable cause. Dkt. 20. The government opposes the motion, contending that the trooper smelled raw marijuana while approaching Mitchell's truck, which gave him probable cause for a vehicle search. Dkt. 37. Mitchell replies that the evidence does not support the trooper's version of events. Dkt. 41.

For the reasons stated below, I am recommending that the court grant Mitchell's motion to suppress evidence.

## Applicable Law

Mitchell is not challenging the initial traffic stop, which was based on uncontested evidence that he was speeding. From there, the government acknowledges that it has the burden to establish probable cause that there was contraband in Mitchell's truck before the trooper could open the truck door. *See* gov't. Br. in Opp., dkt. 37 at 2; *see also United States v. Cole*, 21

---

[1] The firearm was a Glock 48 9mm semiautomatic handgun with a chambered round, and equipped with a drum magazine containing 25 rounds of ammunition.

F.4th 421,  427-28 (7th Cir. 2021)(traffic stops must remain limited in scope; police may not detour from that mission to investigate other criminal activity); *United States v. Ochoa-Lopez*, 31 F.4th 1024, 1026 (7th Cir. 2022) (police may search a vehicle without a warrant if the search is supported by probable cause).[2]

Probable cause exists when, based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  *Ochoa-Lopez*, 31 F.4th at 1027.  Although there are challenges pending at the district court level, the current law of this circuit is that a police officer who smells the aroma of marijuana wafting from a motor vehicle has probable cause to search that vehicle. *United States v. Shaffers*, 22 F.4th 655, 659 (7th Cir. 2022), *quoting United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008).  So, Mitchell's motion to suppress pivots on whether the trooper actually smelled the aroma of raw marijuana wafting from Mitchell's truck as the trooper approached it.  I conclude that the evidence fails to support this contention.

## Facts

Both sides submitted exhibits, including the trooper's January 7, 2022 testimony at a state preliminary hearing (dkt. 20-1), his March 22, 2022 testimony before the grand jury (dkt. 37-1), and the partial dash cam recording made by the trooper. This court held an evidentiary

---

[2] At the beginning of its brief, the government cites *Pennsylvania v. Mimms,* 434 U.S. 106 (1977) for the proposition that a traffic stop authorizes an officer to order the driver out of his vehicle, dkt. 37 at 2.  Thereafter, however, the government argues that "Trooper Williams was within his authority to open the door to attempt to detain the defendant and also to search the vehicle as previously established."  *Id.* at 5.  I take this as the government's acknowledgment that by this point, the encounter had transcended a simple traffic stop for speeding.  This is all the more evident from Trooper Williams's testimony that he had expanded his questioning beyond the speeding violation to ask Mitchell whether there was marijuana in the truck.  *See* Ev. H'ing. Tr., dkt. 35, at 12-13, along with his testimony that upon smelling this raw marijuana he decided to detain the driver for further investigation.  Prelim. H'ing Tr., dkt. 20-1, at 20.

hearing on October 4, 2022 (*see* transcript, dkt. 35).  Having carefully considered all of the transcripts and exhibits, and having carefully considered the testimony and the demeanor of the witnesses, *see United States v. Olson*, 41 F. 4th 792, 802 (7th Cir. 2022), I find the following facts:

### The stop and search

Keegan Williams is a Trooper with the Wisconsin State Patrol who had been with WSP for about six years at the time.  Part of Trooper Williams's training included a 40-hour segment on drug investigation.  He was trained to identify and detect controlled substances by sight and by smell.  Trooper Williams is familiar with the odor of raw marijuana, which he deems the easiest drug to detect by smell on the roadside because of its strong, unmistakable aroma. Trooper Williams investigates drug crimes on average a couple of times a month.

Bridging the late evening of December 21/early morning of December 22, 2021, Trooper Williams was on duty on I-94 in Jefferson County, west of Johnson Creek, operating a fully-marked squad car equipped with a radar device and a front-facing video camera, often referred to as a dash cam.  He was parked in the median, facing west toward Madison.  At about 1:20 a.m., the radar in Trooper Williams's squad car clocked an eastbound pickup truck traveling at about 80 MPH in a 70 MPH zone.   Defendant Brian Mitchell was driving this truck, accompanied by a female passenger.  Trooper Williams pulled out to perform a traffic stop of the truck.  Mitchell pulled over and stopped on the shoulder.

What happened next forms the factual crux of Mitchell's suppression motion: Trooper Williams contends that as he approached the truck from behind, he smelled the strong odor[3] of

---

[3]Ev. H'ing Tr., dkt. 35, at 12.

raw marijuana emanating from the truck, whose windows and doors still were shut.[4]  Trooper Williams testified that he questioned Mitchell through the now-open driver's window; after explaining the speeding stop and looking at Mitchell's driver's license, Trooper Williams says he asked Mitchell if there was–or ever had been–any marijuana in the truck; Mitchell said no.

Trooper Williams testified that he asked Mitchell to step out of the truck, but Mitchell declined.  Trooper Williams testified that this caused him to pull open the driver's side door in order to detain Mitchell on a drug charge and to search the truck for drugs.  Upon opening the door, Trooper Williams saw a handgun with an attached drum magazine on the floorboard by Mitchell's left foot.  Trooper Williams grabbed the gun for his own safety. This is the firearm charged against Mitchell in this federal prosecution.

Mitchell sped away, but about 1½ miles down the highway he pulled over on his own, exited his truck and prostrated himself on the highway shoulder.  Trooper Williams caught up to Mitchell and soon was joined by other troopers and deputy sheriffs.  They arrested Mitchell and searched the truck.

Mitchell disputes Trooper Williams's claim that he smelled raw marijuana as he approached Mitchell's truck; Mitchell asserts that Trooper Williams did not have any evidence of a drug violation that would have justified opening the door of Mitchell's truck to detain him and to search the truck.

---

[4] It might be more accurate to find that there is no evidence that any of the windows were open.

4

### The physical circumstances attendant to the traffic stop

The challenged search took place after midnight on December 22, 2021. It was cold and a steady wind was blowing.[5] The truck was a Dodge Ram crew cab with four passenger doors and an interior back seat.

When the state troopers encountered and arrested Mitchell following his brief flight, they searched his truck. This search resulted in the seizure of a Crown Royal Bag containing MDMA pills and about three ounces of fentanyl and cocaine. Also found on the floor of the backseat of the truck was a backpack.[6] In this backpack was "just a small amount" of marijuana: according to Trooper Williams,

> It wasn't contained in any sort of bag. It was just kind of what was left from maybe something once being in there, but it was scattered all around the bag, and there was–it was such a small amount that I – there would be no value in seizing it as evidence.
>
> Ev. H'ing Tr., dkt. 35, at 19.[7]

No other marijuana was detected–visually or by aroma–during this on-the-scene search of the truck.

---

[5] After the court closed the evidentiary record, Mitchell submitted internet records reporting an air temperature in Madison around 17° F, with a 13 MPH east wind. This prompted an objection from the government, which is procedurally well-taken, but which, as a practical matter, lacks traction. I will not find as facts what the actual temperature was or how fast the wind was blowing that night, but it is fair and accurate for the court to note that it was late December in Wisconsin; that the troopers seen on the extant video were wearing gloves, watch caps and jackets, and their breath can be seen. The video also shows the tall grass to the right of the highway quivering under a steady wind. Further, it would be Judge Conley's prerogative under 28 U.S.C. § 636(b)(1) to receive additional evidence on this point if he thought it would be helpful to his ruling on Mitchell's motion.

[6] Trooper Williams repeatedly refers to the backpack being in the "bed" of the truck, but at the time of the stop, the backpack was inside the passenger compartment in the back seat. Trooper Williams moved it to the bed while searching the truck, although he does not recall doing this. *See* video of traffic stop at 16:45; Ev. H'ing Tr., dkt. 35 at 42.

[7] This description of the marijuana is inconsistent with Trooper Williams's testimony at the state court preliminary hearing. More on this below.

Either later that same night, or more likely the next night, Trooper Danny Daniels was tasked with searching Mitchell's impounded truck for a set of keys that belonged to the passenger. The truck was parked indoors at an impound lot. Trooper Daniels didn't find the keys, but he testified that he found a small "personal use" amount of marijuana in a plastic bag that was twisted closed and cached in a cup holder in the driver's side door. This bag of marijuana had not been discovered or reported by the two officers who had searched the truck–including its driver's door[8]–the night of the traffic stop. Trooper Daniels testified that he could not smell this marijuana before he opened the truck door, and that even then, the odor was "faint." He testified that he did not seize this marijuana, he left it where it was in the truck. He did not photograph it. He did not report it until Trooper Williams asked him to later.

Based on the remarkably small amount of marijuana discovered–but never seized, photographed, or preserved by the State Patrol–inside a backpack inside the closed truck, and inside a closed baggie inside a cup holder inside the closed truck–which was not detected at all by Trooper Williams (or the assisting deputy sheriff) during their December 22 search–in conjunction with the cold, windy weather that night, I find and conclude that Trooper Williams's claim that he smelled the odor of raw marijuana as he approached Mitchell's truck is incredible.[9]

---

[8] *See* Ev. H'ing. Tr., dkt. 35 at 45-46: Trooper Williams first testified that during his on-site search of Mitchell's truck he had seized an iPad from a compartment on the driver's side door, then changed his testimony to "I must have missed the door, I suppose." This testimony establishes that when Trooper Williams was *inside* the truck conducting his search, he did *not* smell the aroma of raw marijuana emanating from the bag that Trooper Daniels claims to have found in the door later.

[9] *See, e.g., United States v. Randle*, 2022 WL 17038795 (S.D. Ind. 2022) *at* *3 (officer's claim that he smelled raw marijuana is more believable when he is near lots of it, less believable when he is far from small amounts).

True, this was not *impossible,* in the sense that it would violate the immutable laws of nature, *see United States v. Kuzniar,* 881 F.2d 466, 471 (7th Cir. 1989).  However, as the court observed in *Sandoval v. Acevedo*, 996 F.2d 145, 150 (7th Cir. 1993), "anything is possible but this is distinctly unlikely."  *Cf. Olson*, 41 F.4th at 802 (appellate court may deem a lower court's credibility determination clearly erroneous where a magistrate judge "credited exceedingly improbable testimony"), *quoting United States v. Wendt*, 465 F.3d 814, 816 (7th Cir. 2006).

Many judicial officers–including this one–will, when the circumstances justify it, give law enforcement officers the benefit of the doubt when they testify, because the officers have training and experience in their field,[10] and as trial and hearing witnesses.[11]  But as noted in the following sections, the circumstances here do not justify crediting Trooper Williams's account of what he claims to have smelled.

### No marijuana was seized or photographed

The state troopers did not seize or contemporaneously document their discovery of the marijuana that Trooper Williams claimed to have smelled and that Trooper Daniels claimed to have found in the cup holder.  Both troopers testified that they viewed these small amounts of marijuana to be insignificant in the scheme of things, a view the government endorses in its opposition brief.  It turns out, however, that the presence, amount, and location of any raw marijuana in Mitchell's truck are facts material to Mitchell's suppression motion.

---

[10] *See, e.g., Olson*, 41 F.3d at 800 (officers may lean upon their experience and specialized training to draw inferences from and deductions about available cumulative information)

[11] *Cf. Delgado v. Merit Systems Protection Board*, 880 F.3d 913, 923 (7th Cir. 2018) (court notes that law enforcement officers are trained to observe and to testify accurately; even so, honest differences in perception, memory and viewpoint often produce differences in their testimony).

Trooper Daniels's candid explanation of how he mishandled the baggie of marijuana that he claims to have found in the cup holder is telling. He testified that he did not seize or preserve this marijuana: he just left it there, knowing that the truck was going to be turned over to a civilian to drive away, with contraband still cached in the cup holder. Trooper Daniels admitted that it was uncommon to fail to seize contraband in plain view– in fact, it was contrary to State Patrol practice–but that he and his sergeant nonetheless decided to ignore it. Trooper Daniels wasn't even going to write a report about finding this marijuana until Trooper Williams asked him to. Ev. H'ing. Tr., dkt. 35 at 62-63 & 65-66.

Trooper Daniels also testified that he opened and thoroughly searched two backpacks inside the truck to look for the missing keys: he did not find any marijuana, any nugs, any shake, or any marijuana byproducts in either backpack. *Id.* at 64-65 and 69. Presumably, one of these backpacks was the one in which Trooper Williams claims to have discovered the paltry amount of marijuana that he chose not to seize. To the same effect, Trooper Daniels did not testify that he smelled the aroma of marijuana emanating from either backpack. Trooper Daniels's failure to corroborate Trooper Williams's testimony impeaches it.

### There is no recording of the traffic stop

Trooper Williams's squad car was equipped with a dash cam. When that dash cam was actually functioning properly, it kicked in when Trooper Williams activated his emergency lights. The dash cam would save 30 seconds of video prior to the lights having been activated, although there will be no audio for this portion; the dash cam then would continue to record with audio going forward in time.

On December 22, 2022, there is no recording of Trooper Williams's first traffic stop of Mitchell.  The recording begins during the second stop, when Trooper Williams is driving up to Mitchell's stopped truck, Mitchell splayed prostrate beside it.  Trooper Williams testified  that his dash cam had been misbehaving for months, and that he had reported this problem within the state patrol, but that, as of December 22, 2022, his dash cam had not been fixed.  Trooper Williams testified that at the time he wrote his reports about this incident, he had not yet attempted to review the recording, so he did not know that there was no recording of the first stop.

Mitchell has not claimed that Trooper Williams intentionally erased a useable recording of his first encounter with Mitchell that night, so the court will not draw a spoliation inference against the government.  *See United States v. Rebolledo-Delgadillo*, 820 F.3d 870, 878 (7th Cir. 2016) (in the absence of evidence that government destroyed parts of the recording or tampered with the recording device, defendant not entitled to jury instruction allowing inference that the destroyed portions were unfavorable to the government).  But the absence of a recording deprives the court of an objectively trustworthy source of information that literally would have provided an accurate picture of what happened during the initial encounter between Trooper Williams and Mitchell.

**Trooper Williams's testimony, evidentiary hearing demeanor and prior statements**

In his opening brief, Mitchell challenged the contradictions in, memory lapses regarding, and dubiousness attendant to Trooper Williams's various accounts of what happened. *See* dkt. 36 at 9-11.  The government responds, in essence, that (1) Trooper Mitchell's self-contradiction

and memory lapses can be attributed to stress and exhaustion, similar to that noted in *United States v. Olson*, 41 F.4th at 797-98; (2) there are explanations for why other evidence doesn't seem to support Trooper Mitchell's accounts; and (3) on the night of the stop and forever after, Trooper Williams has consistently reported to his fellow officers, to dispatch, and at evidentiary hearings that he had smelled raw marijuana as he approached Mitchell's truck.  None of the government's repair-attempts is persuasive.

To begin, *United States v. Olson* is inapplicable to this case.  As the Court of Appeals noted, "context is crucial to our ruling here. We cannot overstate the singularity of the conditions in Madison that night." 41 F.4th at 801.  In other words, the *Olson* decision does not give the government *carte blanche* to trot out fatigue and stress as excuses for discrepancies in law enforcement reports.  I held the evidentiary hearing in *Olson* and I judged the testimony and demeanor of Officer Marzullo, Det. Hamilton and Det. Gatdula. *See* May 7, 2021 Report and Recommendation, Case No. 20-cr-75, dkt. 52.  There is no comparison between the grueling sleep deprivation and extreme stress that those officers experienced and that now claimed by the government on behalf of Trooper Williams, who was conducting what began as a routine traffic stop during his normal overnight shift.

This segues to my assessment of Trooper Williams's testimony and demeanor at our October 4, 2022 evidentiary hearing. Trooper Williams was palpably nervous and defensive, and he provided what I deem to be evasive and unpersuasive answers to at least two lines of cross-examination.  As noted at the outset, I am inclined to give law enforcement witnesses the benefit of the doubt when appropriate, but I cannot recall ever being so surprised and puzzled by a veteran law enforcement officer's dubious performance on the stand.

10

This then segues to the government's attempt to minimize the various contradictions and discrepancies in Trooper Williams's testimony and statements.  It is bailing against the tide.  There are too many questions for this to work.  For instance:

While searching Mitchell's truck with Deputy Sheriff Vandezande, Trooper Williams jokes that "I was about to message him [*Trooper Polizzi*] before I even stopped the car, 'hey come, come, come back me up, because I smell drugs!' [*Chuckles*]."  Since when is it funny for a law enforcement officer to joke about fabricating evidence to justify a vehicle search?  The only logical inference to draw from this unguarded quip is that Trooper Williams had made up his mind to claim that he smelled drugs at the time he initiated pursuit of Mitchell's truck.  That was his story and he has, indeed, stuck to it.

Then there are Trooper Williams's contradictory sworn descriptions of what he claims to have found in the backpack.  At this court's evidentiary hearing, Trooper Williams testified that the marijuana  "wasn't contained in any sort of bag.  It was just kind of what was left from maybe something once being in there, but it was scattered all around the bag, and there was–it was such a small amount that I – there would be no value in seizing it as evidence."  But at Mitchell's January 7, 2022 preliminary hearing in the Circuit Court for Jefferson County, Trooper Williams described a "tiny amount" of marijuana in a black backpack in the backseat of the truck, which he described as a quarter-sized "nug."[12]  Dkt. 20-1 at 18.  There is no mistaking a "nug" for "shake": they are opposites.  So, the best that can be said about Trooper Williams's self-contradiction is that he simply doesn't remember what he actually saw in the

---

[12] "Nug," short for "nugget," is slang for a small marijuana bud or a chunk of a larger bud. Loose remnants of marijuana are often referred to as "shake."

backpack, if he actually saw any marijuana at all.  He failed to seize or photograph it, so there is no way for anyone else to know.

This segues to Trooper Daniels's claim to have found a twisted-shut baggie of marijuana in the driver's door upholder, which *he* failed to seize or photograph.  Trooper Daniels didn't smell this marijuana until after he opened the door of the truck, which had been sitting stationary indoors for close to 24 hours, and he described the odor as faint.  If this is the marijuana that Trooper Williams claims to have smelled from outside the closed truck, then how could he and Deputy Vandezande both have missed it completely when they were *inside* the truck searching it on the scene?  Further, it defies credulity for the odor of this marijuana to have reduced so precipitously in 24 hours while stored in a closed baggie.

Finally, Mitchell challenges Trooper Williams's explanation as to why he attempted to forcefully detain Mitchell while outnumbered two-to-one, without waiting for backup that he knew was nearby.  Mitchell reminds this court that it encountered a virtually identical fact pattern in *United States v. Carter*, 2006 WL 435461 (W.D. Wis. 2006): there, a state trooper claimed to have smelled the aroma of burning marijuana from the moment she approached the defendant's car; the trooper then removed the defendant from the car and accused the driver and his passenger of rolling blunts, which they denied. *Id.* at *1.  This court (this judicial officer, again) concluded that if the trooper actually had smelled marijuana smoke, then logic, caution and training all would have militated toward her handling the stop very differently.  As a result, the court concluded that the trooper had not actually smelled marijuana. *Id.* at *3.

My views on this topic haven't changed in the 16 years since *Carter*, but in the instant case, the inference I draw from Trooper Williams's handling of the stop is more muted: it was

12

incautious to the point of recklessness for him not to wait for backup that he knew was nearby, but this, by itself, does not establish that Trooper Williams did not smell raw marijuana before he tried to remove Mitchell from the truck.  It does, however, reinforce my conclusion that absolutely nothing about this poorly-executed traffic stop supports the government's claim that Trooper Williams had probable cause to initiate a vehicle search.

This leads to my final observation: under the totality of the circumstances, the number of times that Trooper Williams repeated his claim that he had smelled raw marijuana does not countervail all of the other factors that fail to support it.

### Conclusion

Brian Mitchell is a repeat felon with a ten–page rap sheet dating back to 2005, when he was sixteen years old.  *See* March 23, 2022 Pretrial Service Report, dkt. 5 (sealed).  On December 22, 2021, while serving a sentence of state supervision, Mitchell allegedly possessed a powerful handgun and distribution quantities of several controlled substances.[13]  There is no question that Mitchell is a dangerous lawbreaker.  Even so, he still has Fourth Amendment rights, and he may seek suppression of the firearm charged against him federally.

Maybe this makes Mitchell a poster child for questioning the logic behind and the societal costs attendant to the exclusionary rule in criminal cases, *see, e.g. Guzman v. City of Chicago*, 565 F.3d 393, 398-99 (7th Cir. 2009), but as Judge Rovner noted in that same case, "the continued vitality of the exclusionary rule is a matter solely for the Supreme Court to consider." *Id.* at 399 (Rovner J., concurring).  Notwithstanding its arguable flaws, the exclusionary rule is

---

[13] This already has resulted in the revocation of Mitchell's state supervision, and the Wisconsin Department of Corrections has imprisoned him at least until the end of 2024.

still the law of this circuit, *see United States v. Davis*, 44 F.4th 685, 689 (7th Cir. 2022), and this court must–and will–enforce it when appropriate.

Here, the government has not established probable cause to justify the search of Mitchell's truck and the seizure of his firearm.   Mitchell is entitled to suppression.

## RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I am recommending that this court grant defendant Brian Mitchell's motion to suppress evidence.

Entered this 4th day of January, 2023.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Madison, Wisconsin  53703

Chambers of                                                                                                    Telephone
STEPHEN L. CROCKER                                                                                    (608) 264-5153
U.S. Magistrate Judge

January 4, 2023

Steven Anderson
United States Attorney's Office
222 West Washington Avenue, Ste. 700
Madison, WI 53703

Murali Jasti
Jasti & Khandhar, LLC
2 South Carroll Street, Ste. 230
Madison, WI 53703

Re:    United States v. Brian Mitchell
       Case No. 22-cr-36-wmc

Dear Counsel:

The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before January 19, 2023, by filing a memorandum with the court with a copy to opposing counsel.

If no memorandum is received by January 19, 2023, the court will proceed to consider the magistrate judge's Report and Recommendation.

Sincerely,

/s/

Connie A. Korth
Secretary to Magistrate Judge Crocker

Enclosures

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the  full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

> (1) injunctive relief;
> (2) judgment on the pleadings;
> (3) summary judgment;
> (4) to dismiss or quash an indictment or information;
> (5) to suppress evidence in a criminal case;
> (6) to dismiss or to permit maintenance of a class action;
> (7) to dismiss for failure to state a claim upon which relief can be granted;
> (8) to dismiss actions involuntarily; and
> (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation.  Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct  a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).**